# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 8:05CR398 |
| vs. ) | |
| ) | REPORT AND |
| CHRISTIAN BARRAZA-MACIEL, ) | RECOMMENDATION |
| ) | |
| Defendant. ) | |

This case is before the court on the MOTION TO SUPPRESS (#26) filed by defendant, Christian Barraza-Maciel. The motion was heard January 31, 2006, and the transcript (#44) was filed on February 16, 2006. After allowing the government and defendant time to submit post-hearing briefs, the motion was deemed submitted on March 2, 2006.

Barraza-Maciel alleges that evidence seized from him and statements he made on September 29, 2005, should be suppressed. Specifically, he alleges that his arrest in Iowa by Iowa law enforcement officers, with the assistance of members of the Omaha police department and the Sarpy County Sheriff's Department, was illegal, and that evidence seized subsequent to his arrest is inadmissible as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

## FACTUAL BACKGROUND

Greg Gonzales testified that he is a sergeant with the Omaha Police Department assigned as a night shift narcotics supervisor. In September 2005 he participated in a narcotics investigation involving Carlos Alvarez. Alvarez had come to the attention of police

through a cooperating witness ("CW"), who indicated Alvarez was distributing and selling multi-ounce quantities of ice methamphetamine. The CW also informed Gonzales that Alvarez obtained methamphetamine from a taller Hispanic male in his twenties, who drove a silver Mitsubishi Eclipse. The taller male was later identified as the defendant, Christian Barraza-Maciel (6:22-7:14).

Gonzales testified that on September 21, 2005 the Omaha police used the CW in a controlled purchase of methamphetamine from Alvarez. The purchase took place at the CW's business at 16th and Locust (7:15-21), after the witness had contacted Alvarez by phone and arranged the purchase of two ounces of methamphetamine.

Gonzales testified that when Alvarez showed up at the business, he was alone; however, a silver Mitsubishi Eclipse arrived a short time later. Its occupant, defendant Barraza, entered the location. Inside, Alvarez delivered the methamphetamine to the CW and the CW paid Alvarez. Alvarez then gave a portion of the payment to Barraza and Barraza left, re-entered the Eclipse, and drove from the business (8:22-9:9).

Gonzales testified that on September 29, 2005 the same CW was again used in another controlled purchase from Alvarez. Gonzales watched as a green Bravada occupied by two individuals arrived at the CW's business and both occupants entered the building (10:14-11:21). Although the pre-arranged deal was for the delivery of four ounces of methamphetamine, only two ounces were delivered. The CW was told that the additional two ounces would be obtained from an undisclosed location (11:19-12:2). The two men then

re-entered the Bravada and drove to 6912 North 16th Street, where the passenger exited the vehicle and entered a trailer (12:8-21). Based upon their belief that the driver of the Bravada was going to obtain the additional two ounces, the police followed the Bravada as it drove to Lake Manawa, Iowa and parked (12:22-13:5). Shortly thereafter, a second vehicle pulled up and the occupants were observed talking with each other. Gonzales testified that it was during this time that he contacted Iowa police officers and informed them that the occupant of the Bravada was involved in the delivery of two ounces of methamphetamine to a CW in Omaha, Nebraska (13:16-24). At about the same time Gonzales was advised by the Omaha police that the additional two ounces of methamphetamine had been delivered in Omaha to the CW (15:3-10).

Gonzales testified that because it was getting dark and because he was not familiar with the area and might lose the subject, he made the decision to arrest the individual in the Bravada and he advised the Iowa officers that he wanted the suspect arrested (15:21-16:19). He stated that the arrest was made based on a policy of the Omaha police department that when a felony occurs in the presence of officers, based on probable cause, the suspect should be detained and booked as a fugitive from justice (16:5-11). At Gonzales' direction, Barraza was arrested by the Council Bluffs, Iowa police department (17:4-5).

Gonzales testified that following the arrest he contacted Barraza, advised him of his *Miranda* warnings, and that Barraza gave a statement and consented to the search of his apartment in Nebraska (17:6-15; 20:7-10). Barraza was held by the Council Bluffs police

until 6:00 the following morning when Omaha police obtained a warrant for his arrest (18:2-7). Gonzales admitted that at the time of the arrest in Iowa there was not an active warrant in Nebraska (21:14-20).

Beau Wake testified that he is a member of the Council Bluffs police department narcotics unit, currently assigned to the Southwest Iowa Narcotics Enforcement Task Force (SWINE), where he investigates crimes involving narcotics (24:15-25:8).

Wake testified that on September 29, 2005 he was called to assist an investigation that started in Omaha as a controlled buy of methamphetamine and resulted in a Bravada being followed to Iowa and parking in the Lake Manawa State Park (26:11-20).

Wake testified that after conversations with Gonzales and as a result of Gonzales' specific instructions, he arrested the driver of the Bravada (27:12-18; 32:2-11; 34:22-25), who was later identified as Barraza (27:21-28:5; 28:21-29:1).

Wake testified that after Barraza was searched for weapons, he was "handed over to Gonzales." (29:21-25). Wake admitted that at the time of the arrest he knew there were no outstanding warrants for Barraza in Nebraska (30:20-22), and that Barraza was booked in Iowa as a fugitive from justice (30:17-19; 33:14-21). Wake stated the arrest of Barraza as a fugitive from justice was "just protocol, that when you have an offense that occurred in another state and the subject comes to Iowa but does not deliver controlled substances in Iowa, he is a fugitive from justice from another jurisdiction." (31:12-21).

**LEGAL ANALYSIS**

The defendant argues, simply, that he was illegally arrested in Iowa by Iowa officers acting at the direction of an Omaha Police Sergeant, the Iowa officers did not have probable cause to believe that the defendant had committed any crime in Iowa, and the Omaha officers had no jurisdiction to arrest the defendant in Iowa. Thus, all evidence derived from his arrest must be suppressed pursuant to *Wong Sun v. United States*, 371 U.S. 471 (1963).

The government argues that the legality of the arrest is governed by federal law, there was probable cause to arrest, and the arrest was valid under both federal and state law.

**A. Federal Law**

In a federal prosecution, the court evaluates challenges to actions performed by state authorities under federal Fourth Amendment standards. *United States v. Bieri*, 21 F.3d 811, 816 (1994). "A court must examine the legality of a search by state officers as if made by federal officers." *Id.* (citing *United States v. Eng*, 753 F.2d 683, 686 (8th Cir. 1985)). "'[E]vidence seized by state officers in conformity with the Fourth Amendment will not be suppressed in a federal prosecution because *state* law was violated.'" *Id.* (quoting *United States v. Moore*, 956 F.2d 843, 847 (8th Cir. 1992) (emphasis in original)).

As the Court of Appeals explained in *United States v. Bell*, 54 F.3d 502, 503-504 (8th Cir. 1995), *cert. denied*, 519 U.S. 955 (1996), the exclusionary rule only requires a federal court to exclude evidence obtained in violation of the Federal Constitution.

> Because states may impose rules for arrests, searches, and seizures that are more restrictive than the Federal Constitution, state law violations do not necessarily

> offend the Federal Constitution. [*United States v. Wright,* 16 F.3d 1429, 1434 (6th Cir.), *cert. denied,* 512 U.S. 1243 (1994)]. Thus, when a federal court must decide whether to exclude evidence obtained through an arrest, search, or seizure by state officers, the appropriate inquiry is whether the arrest, search, or seizure violated the Federal Constitution, not whether the arrest, search, or seizure violated state law. *Id.* at 1437; *see United States v. Eastland,* 989 F.2d 760, 767 (5th Cir.), *cert. denied,* 510 U.S. 890 (1993).
>
> A federal court generally does not look to state statutes to assess the validity of an arrest, search, or seizure under the Fourth Amendment. *Wright,* 16 F.3d at 1433; [*United States v. Maholy,* 1 F.3d 718, 721 (8th Cir. 1993)]. Fourth Amendment analysis requires reference to state law in only a few situations. *See* 1 Wayne R. LaFave, *Search and Seizure* § 1.5, at 34 (2d ed. Supp.1994). For example, to show the reasonableness of an inventory search, the Government must show officers complied with state standardized procedures. *Id.* Nevertheless, we do not think Fourth Amendment analysis requires reference to an arrest's legality under state law. *See id.* at 35-36; *United States v. Walker,* 960 F.2d 409, 416 (5th Cir.), *cert. denied,* 506 U.S. 967 (1992). An arrest by state officers is reasonable in the Fourth Amendment sense if it is based on probable cause. *See* 1 LaFave, *supra,* § 1.5, at 35-36; *Walker,* 960 F.2d at 416....

(Parallel citations omitted).

The issue presented is, therefore, whether the arrest, ***as if made by federal officers***, was supported by probable cause. "A warrantless arrest in a public place is valid if the arresting officer has probable cause." *United States v. Czeck*, 105 F.3d 1235, 1238 (8th Cir. 1997) (citing *United States v. Watson*, 423 U.S. 411, 418 (1976), and *Payton v. New York*, 445 U.S. 573, 590 (1980) (holding that arrest in suspect's home ordinarily requires warrant)). Probable cause "'exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested.'" *United States v. Oropesa*, 316 F.3d 762, 768 (8th Cir. 2003) (quoting *United States v. Hartje*, 251 F.3d 771, 775

(8th Cir. 2001), *cert. denied*, 534 U.S. 1116 (2002)).  A finding of probable cause encompasses the totality of the circumstances, *see Illinois v. Gates*, 462 U.S. 213, 238 (1983), and may be based on the collective knowledge of all officers involved.  *United States v. Morgan*, 997 F.2d 433, 435 (8th Cir. 1993).

In this regard, the defendant was arrested by Iowa officers based on information given by sworn police officers from Nebraska who personally observed and had knowledge of the defendant's activities.  Defendant has not cited any authority suggesting that, in a federal prosecution, the activities constituting probable cause must occur in the state or jurisdiction where an arrest is made.  The court has conducted independent research and cannot find any such authority.

Based on the testimony of Sergeant Gonzalez and Officer Wake, and treating the arrest as if made by federal officers on the basis of their collective knowledge, I find that there was probable cause to believe the defendant was involved in the delivery of two ounces of methamphetamine on September 29, 2005.  The arrest did not violate the defendant's Fourth Amendment rights and should not be suppressed pursuant to *Wong Sun v. United States*.

    **B.   Iowa Law**

In the alternative, I find that the arrest of the defendant by an Iowa officer was permitted under Iowa law, *i.e.*, Iowa Code §§ 804.7 and 804.7A.  Section 804.7 provides, "A peace officer may make an arrest ... without a warrant ... [3] Where the peace officer has

reasonable ground[1] for believing that an indictable public offense[2] has been committed and has reasonable ground for believing that the person to be arrested has committed it[.]"  In this instance, because the court must treat the defendant's arrest as if made by federal officers, I note that Iowa Code § 804.7A provides:

> A federal law enforcement officer has the same authority, as provided in section 804.7, subsection 3 ... when making an arrest in this state for a nonfederal crime if ... the following exists:
> a. The federal law enforcement officer has reasonable grounds for believing that an indictable public offense has been committed and has reasonable grounds for believing that the person to be arrested has committed it....

In this case, the record shows that the arresting officers had probable cause to believe that an indictable public offense had been committed by the defendant.  The statutes do not require that the indictable public offense be committed within the boundaries of the State of Iowa.

The decisions of the Iowa Supreme Court in *State v. O'Kelly*, 211 N.W.2d 589 (Iowa 1973), *cert. denied*, 417 U.S. 936 (1974), and *State v. Lloyd*, 513 N.W.2d 742 (Iowa 1994), also tend to demonstrate that the arrest at issue was permitted under Iowa law.  In *O'Kelly*, a safe was stolen from a business in Omaha.  The safe was discovered the next day in a field

---

[1]The "'reasonable ground for belief'" standard within section 804.7(3) is tantamount to probable cause. *State v. Freeman*, 705 N.W.2d 293, 298 (Iowa 2005).

[2]An "indictable offense" is defined as "an offense other than a simple misdemeanor." Iowa Code 801.4(8).  A "public offense" is "that which is prohibited by statute and is punishable by fine or imprisonment." Iowa Code § 701.2.  Apparently, the Iowa Supreme Court considers the terms "public offense" and "criminal offense" to be synonymous.  *See In the Matter of Property Seized from Kaster*, 454 N.W.2d 876, 878 (Iowa 1990).

in rural Pottawattamie County, Iowa. That night, Iowa officers observed O'Kelly as he and another individual carried objects from the field to the road. The objects included the safe door, the money bags containing the amount of money reported stolen, sledge hammers, bars, and other devices for breaking open a safe. Omaha authorities charged O'Kelly in Nebraska with burglary and sought extradition. O'Kelly waived extradition. His trial for burglary resulted in a hung jury and the charge was eventually dismissed. The Pottawattamie County Attorney then charged O'Kelly with receiving stolen property and extradited him to Iowa. O'Kelly was convicted on the Iowa charge. The Iowa Supreme Court rejected his argument on appeal that the safe and other articles were illegally seized pursuant to an illegal warrantless arrest:

> We may accept the premise, arguendo, but we cannot accept the assertion that the arrest was illegal.
> 
> The arrest was not made by the Nebraska officers only. They were called in by, and were working in conjunction with, the Pottawattamie County sheriff's department, and a deputy sheriff actually participated in the stakeout and arrest. A deputy sheriff has authority to call 'any' person to help him make an arrest. Code 1973, § 337.1. He may arrest without warrant for a public offense committed in his presence, as this incident was. § 755.4(1). Had the deputy made the arrest alone it would have been legal, and we cannot hold it became illegal because he was assisted by others whom he had a right to call to his aid. Actually the arrest was by the posse, and it was not illegal on that account....
> 
> ***Even if the Pottawattamie County sheriff and his deputy had not been involved, the arrest would have been valid.*** When the Omaha officers came to Iowa, they ceased to be officers but they did not cease to be persons. 'An officer who seeks to make an arrest without warrant outside his territory must be treated as a private person. Of course, his action will be lawful if the circumstances are such as would authorize a private person to make the arrest.' 5 Am. Jur. 2d Arrest § 50 at 742. See also 6 C.J.S. Arrest § 12b(2) at 611. A private person may arrest for a public offense committed in his presence, as this offense was. Code 1973, § 755.5(1).
> 
> We hold the arrest of defendant was not illegal. Hence defendant's argument, founded on illegality of arrest, falls.

*State v. O'Kelly*, 211 N.W.2d at 595 (emphasis added).

In *State v. Lloyd*, the defendant was pursued into Iowa and stopped by a South Dakota officer for a taillight violation. The South Dakota officer gave Lloyd a warning ticket for driving without his taillights and a citation for an expired license plate. Lloyd also appeared to be drunk, so the South Dakota officer called a Sioux City, Iowa, police officer to the scene. After conducting field sobriety tests, the Iowa officer charged Lloyd with operating while intoxicated in violation of Iowa law. Lloyd was convicted and argued on appeal that the South Dakota officer had no authority to flag him down and detain him in Iowa; therefore, the evidence of his intoxication should have been excluded. The Iowa Supreme Court rejected this argument, finding that the officer's initial detention of Lloyd "was no less valid than a formal citizen's arrest." As in O'Kelly, the court held that "[a]n arrest by out-of-state officers is valid as a citizen's arrest under section 804.9(1) if made for a public offense committed in the officers' presence." *State v. Lloyd*, 513 N.W.2d at 744. The court further found that the South Dakota officer could have arrested Lloyd based on his belief that Lloyd was driving under the influence.

In the case at bar, the defendant was arrested in Iowa by an Iowa officer who had probable cause to believe that the defendant had committed acts constituting a federal crime. To the extent he argues that his arrest occurred in violation of Iowa law, I find that contention to be without merit.

# RECOMMENDATION

Treating the defendant's arrest in Iowa as if made by federal officers on the basis of their collective knowledge, there was probable cause to believe the defendant was involved in the delivery of two ounces of methamphetamine on September 29, 2005 in Omaha, Nebraska. The arrest did not violate the defendant's Fourth Amendment rights and should not be suppressed pursuant to *Wong Sun v. United States*. In the alternative, the arrest did not violate Iowa law.

For these reasons,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#26) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED March 21, 2006.**

BY THE COURT:

s/ F.A. Gossett
**United States Magistrate Judge**